[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 5, 2004
THOMAS K. KAHN
CLERK

————————————————

No. 03-11589

————————————————

D. C. Docket No. 01-00101-CV-UUB

MORGAN I. LEVY,
ROLANDO OSES, et al.,

Plaintiffs-Appellants,

versus

MIAMI-DADE COUNTY,
a political subdivision of the
State of Florida,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

**(February 5, 2004)**

Before DUBINA, BARKETT and COX, Circuit Judges.

PER CURIAM:

Residents of the Unincorporated Municipal Service Area ("UMSA") within Miami-Dade County ("the County") appeal the district court's dismissal of their claims for violations of the Equal Protection Clause. Miami-Dade County has a two-tiered governing structure with a thirteen-member County Commission that functions both as the UMSA municipal government (the "first tier") and the government for the County as a whole (the "second tier"). In its first-tier capacity, the County regulates development, provides local services, and levies local taxes within UMSA. In its second-tier capacity, the County provides other services funded by county-wide taxes, including airport, transportation, and environmental services. Approximately 1.2 million Miami-Dade residents live within UMSA, forming some 52% of the County's population.

The Appellants' claims are more fully set forth in the district court's opinion. Essentially, however, the Appellants argue that, as residents of unincorporated areas, their votes for municipal government have been unconstitutionally diluted by residents of incorporated areas who also vote in county elections. Because the County Commission also acts as the municipal government for the unincorporated areas, the incorporated residents effectively vote for that first-tier government when they vote for the Commission. The Appellants contend that the configuration of the single-member Commission

2

districts[1] means that a majority of Commission members have a majority of incorporated residents in their districts, effectively giving majority control over UMSA municipal areas to non-UMSA residents. The Appellants allege a multitude of pernicious consequences from this arrangement, including the diversion of UMSA revenues to incorporated and county-wide services.[2] In addition, the Appellants argue that the County imposes impermissible conditions upon any unincorporated areas that now wish to incorporate.

After trial, the district court dismissed the Appellants' constitutional claims on two separate grounds. First, the court concluded that the vote dilution claim was not justiciable because the Appellants did not offer a viable remedy. Levy v. Miami-Dade County, 254 F. Supp. 2d 1269, 1284-87 (S.D. Fla. 2003). In an alternative analysis, after assuming that UMSA was a distinct geopolitical jurisdiction, the district court examined the merits of the Appellants' Equal Protection claims with respect to both vote dilution and to the conditions imposed upon newly incorporating areas. It concluded that rational bases existed for the County's existing electoral and incorporation schemes.

---

[1]The current, single-member district scheme was established following this Court's decision in Meek v. Metropolitan Dade County, 908 F.2d 1540 (11th Cir. 1990).

[2]The Appellants concede that the County has devised new policies to address some of these concerns but insist that the conflicting interests of County Commission members mean these efforts will not be successful.

Although justiciability presents a central issue in this case, the nature of the term has been somewhat difficult to define precisely. In general, justiciability "is the term of art employed to give expression to [the] limitation placed upon federal courts by the case-and-controversy doctrine." Flast v. Cohen, 392 U.S. 83, 95 (1968). In essence, justiciability asks whether "a claim . . . may be resolved by the courts." Nixon v. United States, 506 U.S. 224, 226 (1993). However, as the Supreme Court has noted, the concept of justiciability "has become a blend of constitutional requirements and policy considerations" with "uncertain and shifting contours." Flast, 392 U.S. at 97. Generally, justiciability encompasses a range of doctrines such as standing, see Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 329 (1999) ("Thus, the only open justiciability question in this case is whether appellees satisfy the requirements of Article III standing."); mootness, see City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000) (describing mootness as a question of justiciability); ripeness, see Nat'l Park Hospitality Ass'n v. Dep't of Interior, 123 S. Ct. 2026, 2030 (2003) ("Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements'"); political question, see Nixon, 506 U.S. at 228 ("A controversy is nonjusticiable — i.e., involves a political question — where there is 'a textually demonstrable

4

constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it...'"); and the prohibition against advisory opinions, see Gilligan v. Morgan, 413 U.S. 1, 9 (1973) ("no justiciable controversy is presented when . . . the parties are asking for an advisory opinion"). See also Erwin Chemerinsky, Federal Jurisdiction 44-48 (3d ed. 1999) (describing justiciability as comprising these doctrines). At times, however, the Supreme Court has implied a slightly different categorization. See, e.g., Baker v. Carr, 369 U.S. 186, 198-209 (1962) (treating standing separately from both subject matter jurisdiction and justiciability).

Regardless of the precise contours of justiciability, there is no doubt that the Appellants must demonstrate that the federal courts have the power to grant a viable remedy. Before adjudicating a matter before it, a federal court must decide "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." Id. at 198. In this case, the only aspect of justiciability at issue is the concern that a judicially moldable remedy exist to protect the Appellants' right to vote that has allegedly been infringed upon by the current County electoral scheme. Like the district court, we can see no viable remedy under the circumstances here that could be granted by a federal court to redress the

Appellants' alleged constitutional injury.[3] We thus conclude that their voting rights claim is not justiciable. However, even if it were justiciable, we would agree with the district court's thorough analysis of the merits of the claim. See Levy, 254 F. Supp. 2d at 1288-1291. In addition, we agree with the district court's conclusion that the County has shown a rational basis for the County's current incorporation scheme. See id. at 1292-96. We therefore affirm the district court's judgment in favor of the County.

**AFFIRMED.**

---

[3]We note that some of the cases cited by the district court concern appropriate remedies in the special context of claims brought under the Voting Rights Act rather than questions of justiciability. See, e.g., Presley v. Etowah County Comm'n, 502 U.S. 491 (1992); Burton v. City of Belle Glade, 178 F.3d 1175, 1199 (11th Cir. 1999). However, we agree with the district court's conclusion that the Appellants failed to meet their general burden of demonstrating that a viable remedy exists.